IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
IN RE:                         :
                               :
RONALD N. MICHAUD              :    Case No. 8:13-bk-07220-KRM
                               :
        Debtor                 :    Chapter 7
                               :
- - - - - - - - - - - - - - - -x
RONALD N. MICHAUD              :    Case No. 8:13-ap-00603-KRM
                               :
        Plaintiff              :
                               :
v.                             :
                               :
SALLIE MAE, INC., and          :
EDUCATIONAL CREDIT             :
MANAGEMENT CORPORATION         :
                               :
        Defendants             :
                               :
- - - - - - - - - - - - - - - -x
```

U.S. Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Held February 19, 2014

TRANSCRIPT OF HEARING

Trial on Complaint to Determine Dischargeability
of Student Loan Debt Pursuant to 11 U.S.C.
Section 523(a)(8) (Doc. #1)

BEFORE THE HONORABLE K. RODNEY MAY
UNITED STATES BANKRUPTCY JUDGE

PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

APPEARANCES:


For the Debtor/Plaintiff,        MELANIE A. NEWBY, Esquire
Ronald N. Michaud               Jodat Law Group P.A.
                                521 Ninth Street West
                                Bradenton, Florida 34205
                                941-749-1901
                                melanie.newby@jodatlawgroup.com


For the Defendant,              JOHN D. EATON, Esquire
Educational Credit              Shawde & Eaton, P.L.
Management Corporation          1792 Bell Tower Lane
(ECMC)                          Weston, Florida 33326
                                954-376-3366
                                jeaton@shawde-eaton.com


Also Present                    Ronald Michaud

INDEX:

WITNESSES                                          PAGE

RONALD NORMAN MICHAUD

Direct Examination by Ms. Newby                      9

Cross Examination by Mr. Eaton                       31


EXHIBITS                                   REF.    ADM.

All Exhibits stipulated admitted           4-6     5,10
Marked as ECMC exhibits - for joint use

Deposition transcript of                   4-6       5
Julie Swedback

ECMC Exhibit No. 2                        10,26    5,10

ECMC Exhibit No. 8                          22     5,10

ECMC Exhibit No. 9                          23     5,10

ECMC Exhibit No. 13                         32     5,10

ECMC Exhibit No. 6                          33     5,10

ECMC Exhibit No. 5                          35     5,10

ECMC Exhibit No. 4                          46     5,10

ECMC Exhibit No. 12                         47     5,10

ECMC Exhibit No. 10                         48     5,10

ECMC Exhibit No. 11                         48     5,10

ECMC Exhibit No. 7                          55     5,10

P R O C E E D I N G S

1

2     (Proceedings commenced at 2:06 p.m.)

3          COURTROOM CLERK:  Court is again in session.  You

4     may be seated.

5          THE COURT:  Okay.  Thank you, Ms. Murphy.  If you

6     would call our adversary.

7          COURTROOM CLERK:  Yes, sir.  Thank you, sir.

8     Case No. 13-7220, Ronald N. Michaud, and Adversary Proceeding

9     13-603.

10          THE COURT:  All right.  And let's take appearance

11     of counsel for the recording that we're making.

12          MR. EATON:  Good afternoon, Your Honor.  John

13     Eaton on behalf of Educational Credit Management Corporation,

14     which I will refer to as ECMC.

15          THE COURT:  Thank you.

16          MS. NEWBY:  Melanie Newby for the Debtor, Mr.

17     Michaud.

18          THE COURT:  All right.  And Mr. Michaud is at

19     counsel table.

20          Okay, what are we doing here today?  Ms. Newby,

21     it's your complaint, and you have the burden of going forward

22     and proving up your case, so where are we today?

23          MS. NEWBY:  Right.  Well, we've stipulated to a lot

24     of exhibits already, and I believe that they're up there for

25     you.

1          (Exhibits stipulated admitted.)

2          MR. EATON:  The exhibits of which she's speaking,

3  Your Honor, ECMC has exhibits which we had provided.  I don't

4  believe that she has any exhibits.  She has no objection to

5  the entry of any of ECMC's exhibits.  The other additional

6  piece of evidence that ECMC would present after she rests

7  would be the deposition transcript of an ECMC witness by the

8  name of Julie Swedback.

9          I did not know whether the Court's procedure was to

10  mark that as a separate exhibit or treat it as testimony in

11  light of the way the order was originally drafted setting the

12  trial, but that has been presented for the Court as well.

13          THE COURT:  All right.

14          MS. NEWBY:  And we don't have any problems with the

15  transcript.

16          (Swedback deposition exhibit stipulated admitted.)

17          THE COURT:  All right.  We will include the

18  transcript of Ms. Swedback.  Do you have these, Ms. Murphy?

19          COURTROOM CLERK:  I do not, sir.  That's the only

20  copy, sir.

21          THE COURT:  Okay.  We'll keep that and --

22          MR. EATON:  Your Honor, I do have an extra copy

23  of the Ms. Swedback transcript, and I do have a set of the

24  exhibits for the witness, which I can then provide to the

25  Court at the end of the trial, if you need more than one

1    copy.

2            THE COURT:  Okay.  You have the exhibits, Ms.

3    Murphy?

4            COURTROOM CLERK:  I do not, sir.  That is the only

5    copy that I have.

6            THE COURT:  And what are these?  These are like --

7    are these exhibits that you're both using?

8            MR. EATON:  Apparently Ms. Newby is going to use

9    them as well, but I think they come in, I guess, after she

10   puts her --

11           THE COURT:  Well, no.  I mean, not if you stipulate

12   that they're admitted, but I --

13           MS. NEWBY:  I have.

14           MR. EATON:  Then you --

15           MS. NEWBY:  I didn't see any need, since we're

16   using the same items, to copy a whole 'nother set.

17           MR. EATON:  And that's fine, Your Honor.

18           THE COURT:  All right.

19           MR. EATON:  And that's fine, Your Honor.

20           THE COURT:  Okay.  So this is for Ms. Murphy.  Now

21   I don't have anything.  And you say you have an extra set of

22   the exhibits?

23           MR. EATON:  I have an extra set for the witness,

24   Your Honor, to the --

25           THE COURT:  Well, then Ms. Murphy will hand it back

1    up to me.  Who's the witness going to be?  Mr. Michaud?

2              MS. NEWBY:  Mr. Michaud.

3              THE COURT:  All right.  Well, Ms. Newby, why don't

4    you call your witness then, unless you want to make an

5    opening argument.

6              MR. EATON:  One more piece of housekeeping, Your

7    Honor?

8              THE COURT:  Yes.

9              MR. EATON:  I had explained the particular set of

10   exhibits that you are looking at now that say "Judge" on the

11   front page.  Those are the ones that, I believe, Your Honor,

12   should be used for the official docket and court entries

13   because they've been redacted for social security numbers and

14   the like.  So to the extent they are part of the record, I

15   want to make sure that that's the set which is used.

16             THE COURT:  I'm not sure I followed that.  I only

17   have one set.

18             MR. EATON:  I understand.  I understand that the --

19             THE COURT:  This is all I have is one set, so is

20   the one that we're going to use?

21             MR. EATON:  Yes, Your Honor.

22             THE COURT:  All right.  So Ms. Murphy and I are

23   sharing, and we'll make this the official record.  Okay,

24   Ms. Newby?

25             MS. NEWBY:  Yes, Your Honor.  I suppose Mr. Michaud

1  is going to be sitting in the witness box or is it okay if

2  he --

3            THE COURT:  Well, you need to call your witness.

4            MS. NEWBY:  I would call Mr. Michaud.

5            THE COURT:  Okay.  Mr. Michaud, if you'd come to

6  the center of the courtroom and be sworn in, please.

7            COURTROOM CLERK:  Stand right here, sir.  We record

8  our proceedings so if you could speak to the microphone,

9  please.  Raise your right hand, please, and state your name

10  for the record.

11            THE WITNESS:  Ronald Norman Michaud.

12            COURTROOM CLERK:  Thank you.

13       (The witness was placed under oath by the courtroom

14  clerk, and testified as follows.)

15            COURTROOM CLERK:  Please be seated in the witness

16  box.

17            THE COURT:  All right.  Now, I was told we have an

18  extra set of exhibits for the witness.  You want to go ahead

19  and hand those to --

20            MR. EATON:  If I may approach, Judge?

21            THE COURT:  You may.

22       (Exhibits presented to witness.)

23            THE COURT:  And do you have copies, Ms. Newby?

24            MS. NEWBY:  I do.

25            THE COURT:  Okay.  So you can help your witness

 1  navigate what it is you want him to look at.

 2          MS. NEWBY:  Yes.

 3          THE COURT:  All right.  Your witness.

 4            RONALD N. MICHAUD - DIRECT EXAMINATION

 5  BY MS. NEWBY:

 6  Q   Mr. Michaud, you've already stated your full name.  Can

 7  you please state where you currently live?  Your current

 8  address.

 9  A   I live in Bradenton, Florida.

10  Q   Okay.  And do you rent or do you own a home there?

11  A   I rent.

12  Q   Okay.  And how long have you been at this address?

13  A   Two years.

14  Q   And do you --

15  A   And I was two years prior to that in the same complex.

16  Q   Okay.  And do you intend to remain in this complex for

17  as long as you can?

18  A   Yes.

19  Q   How much do you currently pay for rent there?

20  A   $735 a month.

21          THE COURT:  How much?

22          THE WITNESS:  735.

23  BY MS. NEWBY:

24  Q   And is that --

25  A   It was increased.

1  Q    All right.  I was going to ask about that.  If you will

2  look at Exhibit No. 2.  And it should be Interrogatories --

3  our Answers to the Interrogatories.

4           THE COURT:  All right, all these exhibits have

5  been stipulated for admission into the record, so they're all

6  admitted without objection.  Okay, go ahead.

7      (All exhibits stipulated admitted.)

8  BY MS. NEWBY:

9  Q    And if you want to -- on that exhibit, if you want to

10 turn to page 14.

11          THE COURT:  Okay.  Just for the record, we're

12 talking about Exhibit 2, which is Educational Credit

13 Management Corporation's First Set of Interrogatories to

14 Plaintiff, Ronald Michaud, right?

15          MS. NEWBY:  Yes.

16          THE WITNESS:  Yes.

17          MS. NEWBY:  I'm sorry.

18          THE COURT:  And I've turned to page 14, which has

19 at the top Interrogatory No. 21.

20          MS. NEWBY:  Correct.

21          THE COURT:  Okay.  Go ahead.

22 BY MS. NEWBY:

23 Q    And, Mr. Michaud, for one, do you recognize Exhibit

24 No. 2, the Interrogatories, the questions and the answers?

25 A    Yes.

1   Q    Okay.  And are these the answers that you provided to

2   ECMC a few months ago?

3   A    Yes.

4   Q    All right.  And when you filled out the interrogatories,

5   at least to the best of your knowledge, you were putting down

6   accurate information?

7   A    Yes.

8   Q    Now, on Interrogatory No. 21, it says that the monthly

9   average rent was $701; is that right?

10  A    Right.

11  Q    But you're stating today that it's gone up to 735?

12  A    Right.

13  Q    And you do plan on staying in this complex as long as

14  you can?

15  A    Yes.

16  Q    Now, you know why we're here today?

17  A    Yes.

18  Q    All right.  And we're here to talk about the student

19  loans.  If you could briefly give us a rundown of your

20  educational background?

21  A    I received my BA at University of --

22            THE COURT:  I'm sorry, I can't hear you.

23            THE WITNESS:  I received my BA at St. Mary's

24  University in Baltimore.

25            THE COURT:  In what univer -- St. Mary's?

1              THE WITNESS:  St. Mary's.

2              THE COURT:  Okay.

3              THE WITNESS:  University.

4              THE COURT:  Okay.

5              THE WITNESS:  I also received my Master's in

6      Theology --

7              THE COURT:  In what?

8              THE WITNESS:  Master's in Theology.

9              THE COURT:  Uh-huh.

10             THE WITNESS:  As part of the Ecumenical Institute.

11     BY MS. NEWBY:

12     Q    And that was also at St. Mary's?

13     A    Yes.

14     Q    Okay.  And now those two college stints, where you got

15     your Bachelor's degree and you got the Master's in Theology,

16     did you take out any student loans for those periods?

17     A    No, I didn't.

18     Q    Okay.  So you had other resources or used other

19     resources, I believe, grants for those.

20     A    Right.

21     Q    All right.  After you finished the Master's in Theology,

22     which if you want to look at page number 11 of that same

23     exhibit, the Interrogatories.  And it's Interrogatory No. 15,

24     the letter B, the dates of enrollment.  Are these dates

25     accurate?

1   A     Yes.

2   Q     And it looks like you finished the Masters of Theology

3   in 1978; is that right?

4   A     Correct.

5   Q     What did you do between 1978 and 1990, when you went

6   back to school?

7   A     I worked as a minister.

8   Q     Okay.  And in 1990, you went back to school.

9   A     Yes.  And that was --

10  Q     And what was the purpose of that?

11  A     I was involved in a program where you did your

12  schooling.  And as part of the schooling, you did work with

13  three residents in a home as part of the internship.

14  Q     Okay.

15  A     And as part -- between the internship, we received the

16  grants to pay for the college.  It was all one package.

17  Q     Okay.  And when you said you worked with three residents

18  in a home, what type of residents?  What type of home?

19  A     Special needs individuals.  Special needs adults.

20  Q     All right.  So you worked, and that helped pay for that

21  stint in college.

22  A     Right.

23  Q     Okay.  After you finished there, it looks like in 1991,

24  what did you do?

25  A     I became a director of an assisted living facility in

1   Manchester, New Hampshire, and that's when I started my

2   Master's Program in Business Administration at Rivier

3   College.

4   Q    Okay.  And how did you pay for Rivier College?

5   A    That's when I took out the student loan.

6   Q    Okay.  And it looks like you finished college in 1999 --

7   A    Correct.

8   Q    -- the last stint.  And did you start repaying the

9   student loans?

10  A    I believe so.

11  Q    Okay.  And if you want to look, or if you would please

12  look at page number 12 of that same exhibit, the next page

13  there, Interrogatory No. 16.

14  A    Yes.

15  Q    Okay.  And just to give the judge some background about

16  the payment of these loans over the years, the loans that

17  we're here for arose from a consolidation in 2001.

18  A    Correct.

19  Q    Okay.  And you started making those payments.

20  A    Yes.

21  Q    And according to the paperwork that we submitted, you

22  had to take some deferments; is that correct?

23  A    Right.

24  Q    And why was that?

25  A    For a period of two years, I had to take care of my

1   elderly parents.  My dad had Alzheimer's and my mom was also

2   elderly.  And so they were living with me.

3   Q    Okay.

4   A    And I was their full-time caretaker.

5   Q    All right.  So you applied for and received deferments

6   for those two years; is that right?

7   A    Correct.

8   Q    And then you started making the payments again; is that

9   correct?

10  A    Yes.

11  Q    After that deferment ended in, it looks like in 2004.

12  And then in 2009, you had to take a one-year forbearance.

13          MR. EATON:  Your Honor?

14          MS. NEWBY:  I'm sorry.

15          MR. EATON:  I hate to object but I've been giving

16  some leeway as far as the leading questions --

17          MS. NEWBY:  You have.

18          MR. EATON:  -- but I'm going to object on grounds

19  of leading.

20          THE COURT:  All right.

21          MS. NEWBY:  I can rephrase.

22          THE COURT:  Yeah.  Let the witness tell the story.

23  BY MS. NEWBY:

24  Q    Tell us what happened -- or did you take a deferment in

25  2009?

1    A    Yes, I did.

2    Q    Or a forbearance?  Why was that?

3    A    Right.  In August of 2008 or -- yeah, 2008, I was having

4    medical issues.  I was having heart issues, and I was put on

5    medical leave in August.

6         And then three weeks later, the company that I was

7    working for, I had been working as the Director of Finance,

8    the Chief Operating Finance Officer.  And we had issues for

9    two years with the state funding.  And I was putting in 60,

10   70 hours a week.  And on five different occasions, we had to

11   -- basically had, you know, problems making payrolls.

12        And on a few occasions -- in fact on that last August

13   31st, I had to drive to the State Department of Human

14   Resources to collect a check in order to make payroll.  And

15   the director -- the executive director was with me at the

16   moment and she saw I was having chest pains.  And so she

17   said, "As soon as we drop off the check at the bank, you need

18   to see your doctor immediately," which I did, and he put me

19   on medical leave.

20             THE COURT:  Where was that?

21             THE WITNESS:  In Maine.

22             THE COURT:  But who were you working for?

23             THE WITNESS:  I was at Richardson Hollow Medical --

24   Mental Health Facility.

25             THE COURT:  Richardson what?

 1            THE WITNESS:  Richardson Hollow Mental Health

 2   Agency.

 3            THE COURT:  Okay.

 4            THE WITNESS:  And now -- they went bankrupt and so

 5   they're out of existence, since 2008.

 6            THE COURT:  It's Richardson what?

 7            THE WITNESS:  Richardson Hollow Mental Health --

 8            THE COURT:  How do you spell that?

 9            THE WITNESS:  R-i-c-h-a-r-d --

10            THE COURT:  No, I know how to spell Richardson.

11   The other name.

12            THE WITNESS:  Hollow, H-o-l-l-o-w.

13            THE COURT:  Oh.  Okay.

14   BY MS. NEWBY:

15   Q    And so you got put on medical leave from Richardson

16   Hollow.

17   A    Right.  And they went bankrupt three weeks later, after

18   I went on medical leave.  And so I decided to relocate to

19   Florida.  And on my way to Florida, I end up in the hospital

20   with chest pains.  I was there for a week and they said I

21   needed a stent.  And so they said as soon as I get to

22   Florida, I need to have a stent put in, which I did in

23   October.

24        For the next seven, eight months, I was hospitalized

25   eight times for ongoing medical issues.  I ended up with two

1  stents and a pacemaker, and so I incurred medical -- serious

2  medical issues.  At that point --

3  Q    What was your -- not to interrupt you, but what was your

4  income during this period?

5  A    I was receiving disability income and -- short term

6  disability and I was paying -- because I was on COBRA, I was

7  paying over $730, I believe, a month just on the insurance.

8  Q    And this was private disability, correct?  Not Social

9  Security Disability?

10  A    Right, this was private.  And I had a deductible of

11  2,500.  And then I was paying approximately 1,200 to $1,300 a

12  month just for medications.  So financially I was in trouble

13  and so that's when I asked for the deferment.

14  Q    Okay.  So you had the deferment for how long?

15  A    That was one year, I believe.

16  Q    All right.  And after the deferment was up in 2010, did

17  you resume making the payments on the student loans?

18  A    Yes.

19  Q    Okay.  And at that point, are you saying that your

20  income was the disability income?

21  A    Right, disability insurance.  I was declared -- I was

22  accepted for extended long term disability.

23  Q    Okay.  And --

24        THE COURT:  I'm sorry.  "Accepted," what -- by

25  social security?

1          THE WITNESS:  No.  The insurance disability.

2    Health insurance disability with UNUM.

3    BY MS. NEWBY:

4    Q    So you went from short term to long term?

5    A    Right.

6    Q    Okay.  And when was the next time -- so you'd worked, I

7    believe, up until 2008.  August, you said, of 2008.  When was

8    the next time you secured employment?

9    A    It was in November of 2011 because I knew that my

10   disability insurance was being terminated after five years

11   because I had turned 66 and it would terminate.  And I knew

12   that I was -- without that income per month, I couldn't make

13   it financially.

14        So I resigned as (indiscernible) of the auxiliary

15   volunteers at the hospital and sought employment with the

16   hospital.  So as a matter of fact, I had been working the

17   gift shop for four years as a volunteer, and the vice

18   president of operations of the hospital created a job for me

19   as cashier in the gift shop so I could have part-time work --

20   Q    Okay.

21   A    -- part-time income.

22   Q    And that was in November of 2012; is that right?

23   A    Right.

24   Q    Okay.  And so starting in November of 2012, how many

25   hours were you working?

1  A    Well, I was given 20 hours a week to work.  Within a

2  week, I ended up in the hospital again for heart issues but

3  -- so it was -- I returned to work after a month.

4  Q    Okay.  And have you ever sought full-time employment?

5  A    Actually --

6  Q    Or I shouldn't say "ever."  Since you've been out on the

7  disability, and especially since that has come to an end and

8  your income --

9  A    Right.

10 Q    -- dropped drastically, have you sought full-time

11 employment?

12 A    Yes.  Because I'm having trouble making my -- paying my

13 expenses monthly, I was hoping to be able to find full-time

14 employment.  So I made applications for full-time employment,

15 and have not been able to find a job.

16 Q    Okay.

17 A    Especially since I've been out of work for over five

18 years.

19 Q    Okay.

20 A    I'm not a very good candidate for full-time employment

21 at the hospital.  They know my medical condition so they're

22 not likely to -- because even though I applied for a full-

23 time position in the hospital, they're not likely because

24 it's --

25          MR. EATON:  Your Honor, I'm going to object as to

1   him testifying as to what the hospital is likely to do.  I

2   don't think he is qualified --

3          THE COURT:  I can't quite hear you.  What?

4          MR. EATON:  Sorry, Your Honor.  I don't believe

5   he's qualified to testify as to what the hospital is likely

6   to do.  He can testify as to what he's done and whether or

7   not he's gotten a job, but I don't think he can testify as to

8   whether or not it's likely for the hospital to give him a job

9   based upon any medical conditions that he says he has.

10         THE COURT:  Well, that's more argument.  He's

11  already answered the question, but you can argue that in your

12  closing.

13  BY MS. NEWBY:

14  Q    So Mr. Michaud, you've been working part-time since

15  November of 2012, you've sought -- and you said they created

16  that job for you.

17  A    Right.

18  Q    And you sought a full-time position with Manatee

19  Memorial but that has not come through.

20  A    Right.

21  Q    Correct.  Okay.  So at this point -- oh, and what is

22  your birth date?

23  A    2-13 --

24         THE COURT:  I'm sorry?

25         THE WITNESS:  I was born February 13, 1947.

1    BY MS. NEWBY:

2    Q    Okay.  So last week you turned 67; is that right?

3    A    Yes.

4    Q    Okay.  What is your -- what are your sources of income

5    right now?

6    A    Social security, and then my 20 hours per week of

7    income, which varies between -- well, it had been $1,019 per

8    month social security, and then approximately $650 a month

9    from the hospital.

10   Q    Okay.  And if you will look at No. 8, Tab No. 8, not

11   Interrogatories.  Tab No. 8 in the book.  Not in Exhibit

12   No. 2.  It should be Exhibit No. 8.

13   A    Okay.

14   Q    So you're going to have to flip back some.

15   A    (Locating exhibit.)

16   Q    It says "Your New Benefit Amount" at the top.

17   A    Yes.

18   Q    Do you see that?

19   A    Yes.

20   Q    And is that -- $1,019, is that what you currently

21   receive?

22   A    Well, it's now been increased to $1,036.

23   Q    All right.  So it's gone up $17?

24   A    Right.

25   Q    Okay.  And have you -- is your --

```
 1              THE COURT:  I'm sorry.  It's $1,036 or it's gone up
 2    by 36?
 3              THE WITNESS:  No.  1,036 total.
 4              MS. NEWBY:  Right.
 5              THE COURT:  Okay.
 6    BY MS. NEWBY:
 7    Q    What -- and so you're getting social security and you're
 8    continuing to work at the hospital.  Has your income at the
 9    hospital changed, as far as your hourly rate?
10    A    No.  It's the same rate.
11    Q    and how much do you make?  What its your hourly rate at
12    the hospital?
13    A    $9.00 normal rate.  If I work in the afternoon after
14    3:00 o'clock, they give me an extra dollar.  If I work on the
15    weekends, they give me an extra dollar.
16    Q    Okay.  And I believe if you will look again at Tab
17    No. 9.  It should be the next one.
18    A    (Locating exhibit.)
19    Q    And what is -- do you recognize that?
20    A    Yes.
21    Q    And what is that?
22    A    That's the payment I received for the period of
23    employment from 10-20-2013 to 11-2.
24    Q    Okay.
25    A    For the two-week period.
```

1   Q    All right.  And so for -- looking down at the bottom, it

2   looks like the year-to-date total gross as of ten months of

3   the year being gone, was $8,623,26?

4   A    Right.

5   Q    Okay.  Since -- and have you had any other -- you

6   testified that you -- right after you started the job at the

7   hospital, that you had medical issues that prevented you from

8   working.

9   A    Right.

10  Q    Have you had any other periods during the last six

11  months to a year where you have had to take time off for

12  that?

13  A    Yes.  This past year, I've had four operations.  The

14  last two operations were to basically remove the pacemaker

15  from my left side, and that was done at Sarasota Hospital,

16  and then two days later put in a brand new pacemaker.

17       And that was because for eight months straight I was

18  getting daily infusions of antibiotics, which took about

19  three hours a day at the infusion center, and I received that

20  for eight months.  After eight months, they said that I still

21  had an infection and that's why they had to remove the

22  pacemaker from the left side.

23  Q    And what is your current medical condition?

24  A    Currently --

25            MR. EATON:  Your Honor, I'm going to object to him

1   testifying as to his medical condition.

2           THE COURT:  Overruled.

3           THE WITNESS:  Currently, I've had a problem since

4   about two and a half months ago, I have been suffering from

5   chronic anemia and the doctor put me on iron medication to

6   supplement, because it was -- my iron level was pretty low,

7   and then I was experiencing nausea.

8           In the last couple of weeks, I've had -- well,

9   actually the last six to eight weeks, I've had enlarged

10  glands underneath my jaw, so they put me on antibiotics last

11  week.  And he said, "If the antibiotics doesn't work to

12  reduce the swelling, you'll have to have a biopsy done,"

13  because I may have Hodgkin's disease, and so consequently I

14  would have to take further medications and treatment for

15  that.  It's actually affecting my voice as well.

16  BY MS. NEWBY:

17  Q   So in your Interrogatories -- you can flip back to Tab

18  No. 2 there for a moment.  On page 14 of Tab No. 2.  And this

19  would be our Answers to their Interrogatories.

20          On page 14, Interrogatory No. 22, when you were asked

21  to identify any possible changes in your expenses, you had

22  written that you hoped to decrease your future medical

23  expenses.

24  A   Yes.

25  Q   How likely do you see that at this point?

1   A    Well, this past year, as can be shown in my tax return I

2   filled out, I spent over $10,000 out of my pocket for medical

3   expenses.  And I was hoping that I wouldn't have that long-

4   term medical expenses of infusions and so forth.  And so I

5   was hoping that I would be medically in better health with --

6   right now it's questionable.

7   Q    Okay.  And you testified that you have insurance.

8   A    Yes.

9   Q    Do you have any issues with your insurance as far as how

10  much it covers or if there is a deductible you have to meet

11  or out-of-pocket expenses?

12  A    Right.  Right now, I have about 13 different

13  medications.  10 of them are generic, so the cost for that

14  right now, before the donut hole, is zero dollars.  But I

15  have Ranexa and Symbicort and another medication, and when I

16  go into the donut hole, I have to pay half the cost of that

17  medication.

18       So just the Ranexa, for example, is $350 just for that

19  medication.  Symbicort is approximately the same.  And so

20  this past year, just on medications, I spent over $2,000.

21  So financially, when I go into the donut hole --

22  Q    Things get worse.

23  A    -- it's a real strain.

24           THE COURT:  I may have misunderstood you.  I had

25  written here that this last year you spent $10,000 for

1    medical expenses.

2            THE WITNESS:  Yes.

3            THE COURT:  What is it?

4            THE WITNESS:  10,000.

5            THE COURT:  That's what you -- okay.

6            MS. NEWBY:  I think he was distinguishing between

7    prescriptions and overall.

8            THE COURT:  Well, that's --

9            THE WITNESS:  Right.  The hospitalization, doctors,

10   and so forth.

11           THE COURT:  Well, let's be precise.  I thought I

12   heard you say 10,000 for medical expenses.  And you just now

13   said 2 to 3,000.

14           THE WITNESS:  Just for medications.

15           THE COURT:  Okay.  thank you.

16   BY MS. NEWBY:

17   Q    So to ask you this -- well, let me ask about any assets

18   that you have.  Do you have a car?

19   A    Yes.

20   Q    What kind of car do you have?

21   A    It's a 1999 Oldsmobile Alero.

22   Q    Okay.  And the '99 Oldsmobile Alero, that was the same

23   car that you had when we filed the bankruptcy petition.

24   A    Right.

25   Q    And has that car had any issues over the last year?

1  A    Yes.  I've had problems with the tires, I've had

2  problems with the transmission.  Just recently I had a

3  problem with the brakes.  And to repair the brakes, it would

4  cost over $800, and I didn't have that money, so all I could

5  afford was to fix the front brakes, which cost me about $445.

6  Q    Okay.  So the front brakes are fixed, but you still need

7  to fix the back.

8  A    Correct.

9  Q    Okay.  And looking at the Interrogatories, since we're

10 still on that page, on Interrogatory No. 21, you had sort of

11 put down an average monthly expense amount.  Are those seven

12 categories -- does that cover all of your monthly expenses?

13 A    No, but these are the primary.

14 Q    Okay.  So did you put down the big ones just to show

15 that even the big ones put your income into the negative?

16 A    Right.

17 Q    All right.  Do you see either your income dramatically

18 increasing or your expenses dramatically decreasing in the

19 next -- in the foreseeable future?

20 A    No, I don't.

21 Q    Okay.  Now, other than your 15-year old Oldsmobile, do

22 you have any other assets of real value?

23 A    No, not really, because all my furniture was used

24 furniture that I got.  One of the places I rented from is --

25 when I first moved here, I moved in with someone who I was

1    renting a bedroom from him.  And he had to file bankruptcy

2    and so he moved to out of state and left the furniture, so I

3    got some of that furniture.

4    Q    Okay.  And as far as any luxuries, have you given any

5    big gifts to any family members or friends in the last year?

6    A    Just to my aunt.  She's a religious nun.  And for over

7    the years, I've been giving her at least $100 on her birthday

8    and $100 at Christmas.

9    Q    Okay.  Any other luxuries that you have indulged in in

10   the last six months?

11   A    No.  I haven't even gone out socially because I can't

12   afford to.

13   Q    Okay.  Do you -- because of your pacemaker, is it

14   required that you have a phone line, a land line?

15   A    Yes.  I have a monitor next to my bed that monitors my

16   pacemaker, and that's hooked directly to the phone.

17   Q    Okay.  And what type, if any, of a cell phone do you

18   have?

19   A    I have basically a cell phone where you buy the minutes

20   as you need it.

21   Q    Okay.  All right.  Do you feel -- well, the deposition

22   that has been brought up is the deposition of Ms. Swedback

23   and she was, in her deposition, telling us about various

24   plans of repayment for the student loan.

25        And before I forget, I may have glided over this.  When

1  did you stop making payments on your student loan?

2  A    After I had officially filed for bankruptcy, I had

3  continued making payments until they stopped taking the

4  payments in June, I think, or April.

5  Q    Okay.  So was that after your disability had stopped,

6  you still tried to make payments a couple months.

7  A    Right, I did.

8  Q    Okay.  Based on --

9         THE COURT:  Wait just a second.  Again, it may be

10  just my hearing.  You said you stopped paying in June or

11  April?

12         THE WITNESS:  No, they stopped -- I had automatic

13  withdrawal and --

14         THE COURT:  You had automatic withdrawal?

15         THE WITNESS:  Right.  And so -- because I had filed

16  for bankruptcy, and I think it was April or May when they

17  stopped taking withdrawals.

18         THE COURT:  Okay.

19  BY MS. NEWBY:

20  Q    And based on your current income, what has been

21  discussed -- and what I'm sure that ECMC may question you a

22  little bit more about -- is there's a possibility that you

23  would have a plan payment of zero for 25 years.  Why do you

24  see that as not a very viable option?

25  A    I just feel that given my income and my expenses,

1  even though they say I wouldn't have to pay anything, but

2  that I may have future income or whatever, I just feel that I

3  shouldn't have to be burdened by having to be hounded every

4  year to justify my expenses and income so that I can justify

5  that I have zero payment.

6  Q    But do you understand that if you actually live to be 92

7  under this program, that then the remaining amount would be

8  wiped out?

9  A    Right.

10 Q    Okay.

11 A    But I just don't feel I'll ever live that long.

12 Q    Okay.

13        MS. NEWBY:  All right.  I don't think I have any

14 more questions at the moment, but I'll let Mr. Eaton take

15 over and then I may have a few more.

16        THE WITNESS:  Okay.

17        THE COURT:  Mr. Eaton, your witness.

18        MR. EATON:  Thank you, Your Honor, and I will be

19 brief.

20        RONALD N. MICHAUD - CROSS EXAMINATION

21 BY MR. EATON:

22 Q    Good afternoon, Mr. Michaud.

23 A    Good afternoon.

24 Q    I only am going to have a few questions for you.  Ms.

25 Newby was asking you some questions about the dates when you

1    obtained your various degrees.

2    A    Right.

3    Q    And I think you were referring to your Interrogatory

4    responses, page 11.  And I just wanted to get some

5    clarification because it looks like the dates that were

6    in your Interrogatory responses are different from that which

7    are set forth in your complaint.

8        So if you could turn to Exhibit 13.  It's the last tab

9    that's in there.

10   A    (Locating exhibit.)

11   Q    And if you'd turn to the complaint, and specifically

12   paragraphs 8 and 9 of the complaint.  Are you able to locate

13   that?

14   A    8, yes.

15   Q    Okay.  And in paragraph 9, it says that you completed

16   your coursework obtaining a Master's in Special Education

17   from Maryland College in 2002, and a Master's in Business

18   Administration from Rivier College in 2005.  Are those dates

19   accurate?

20   A    The one from Maryland College, 2002, yeah, I think

21   that's correct.  I'd have to -- that's when I did my Special

22   Education Master's, yes.

23   Q    So you did get a Master's degree in 2002?

24   A    I believe so.

25   Q    And did you also --

1  A    That's where the company I worked for, the internship

2  paid for my actual education.

3  Q    Okay.  And then you also got -- is this accurate?  You

4  got your Master's in Business Administration from Rivier

5  College in 2005.

6  A    Yes.

7  Q    That is correct, okay.  Do you do your own tax returns?

8  A    Yes.

9  Q    Can you take a look at what has been marked as -- in the

10 book as Tab 6?

11 A    (Locating exhibit.)

12 Q    And can we look at the first tax return that's in there,

13 2012?

14 A    Yes.

15 Q    All right.  And it says on line 20(a) you had in 2012

16 social security benefits of 13,271?  Is that correct?

17 A    Yes.

18 Q    And it says the taxable amount is $9,925?

19 A    Yes.

20 Q    Do you know why only a portion of the social security

21 benefits were considered taxable income?

22 A    I put the information in the tax program and it does the

23 calculations.

24 Q    So you don't have any independent knowledge as to

25 whether all of your social security benefits get included as

1   gross income on your tax return or not?

2   A    No.

3   Q    You don't have any knowledge of that.  In the voluntary

4   petition and schedules that you filed with your bankruptcy

5   case, there was a disclosure of compensation that was made

6   payable to Ms. Newby.  It was $2,500; do you recall that?

7   A    Yes.

8   Q    Do you recall paying that to her?

9   A    For when?

10  Q    For the bankruptcy filing?

11  A    Yes.

12  Q    And did you pay her any additional amounts for the

13  bankruptcy filing or just the $2,500?

14  A    Just the 2,500.

15  Q    There were no additional amounts that were ever paid for

16  this lawsuit?

17  A    I just paid this past week $80.40 for the copies of

18  this.

19  Q    But as far as attorneys' fees, did you pay her anything

20  more than the $2,500 that was disclosed in the disclosure of

21  compensation?

22  A    It was -- I paid another $1,000 just for the portion in

23  regards to the Sallie Mae loans.

24  Q    The student loan portion of it.

25  A    Right.

1    Q    And maybe -- I'm not trying to catch you or anything.

2    I just want to make sure the record's clear.  If you'll turn

3    to --

4            MS. NEWBY:  I am going to object, I'm sorry.  But

5    it does say on the disclosure of compensation 1,000 of that

6    2,500 was for this.  It wasn't in addition.

7            MR. EATON:  Your Honor, I understand.  I'm just

8    trying to ask some clarification questions.

9            THE COURT:  All right.  You may proceed.

10   BY MR. EATON:

11   Q    Mr. Michaud, why don't you turn to Exhibit 5?

12           MR. EATON:  And Your Honor, if I may approach the

13   witness, it may be easier for me to try to direct him to the

14   right place.

15           THE COURT:  All right.  Go ahead.

16           MR. EATON:  Towards the -- may I approach the

17   witness, Your Honor?

18           THE COURT:  You may.

19           MR. EATON:  (Presenting exhibit.)  And I'm

20   directing the witness' attention, Your Honor, to the

21   disclosure of compensation form that was part of the

22   petition and which is encompassed within Exhibit 6 --

23   excuse me, Exhibit 5.

24   BY MR. EATON:

25   Q    In question number 7, Mr. Michaud, it says additional

 1  attorneys' fees may be required for services rendered after

 2  the meeting of creditors and for adversary proceedings.  Do

 3  you see that?

 4  A    I see it.

 5  Q    Did you pay any additional attorneys' fees to Ms. Newby

 6  other than the $2,500?

 7  A    No.

 8  Q    Okay.

 9          MR. EATON:  Your Honor,  I have no further

10  questions.

11          THE COURT:  All right.  Ms. Newby, any redirect?

12          MS. NEWBY:  No, Your Honor.

13          THE COURT:  All right.  You may step down.  Thank

14  you, Mr. Michaud.

15      (Witness stands down.)

16          THE COURT:  All right.  Ms. Newby, anything else in

17  your case?

18          MS. NEWBY:  No, Your Honor.

19          THE COURT:  All right.  Mr. Eaton, do you have a

20  case?

21          MR. EATON:  Your Honor -- thank you very much.

22  Your Honor, just that I would move into evidence, to the

23  extent they're not already in, the exhibits that we had, and

24  I had the deposition transcript of Ms. Julie Swedback, which

25  I had already provided to Ms. Newby and to the Court.  And if

1   the Court wishes, I do have this extra set of exhibits and an

2   extra copy of the deposition transcript.

3           THE COURT:  That would be fine, yes.  That would be

4   helpful because I like to --

5           MR. EATON:  If I may I approach, Your Honor?

6           THE COURT:  I like to mark things up.  Yes, you can

7   hand those up.

8       (Exhibits presented.)

9           THE COURT:  So I guess my next question to each of

10  you is whether you would like to submit any kind of written

11  post-hearing argument, or whether you want me to just go back

12  and read stuff, or whether you want to argue now.

13          It's a complex -- the facts here are pretty simple

14  but, you know, walking through the factors that we must,

15  under the Eleventh Circuit precedent, look through, can be --

16  you've got three different factors and three different -- or

17  four different sub-factors under each of those factors, so

18  it's like 20 different little prisms you have to look

19  through.

20          What do you want to do, Ms. Newby?

21          MS. NEWBY:  I'd be happy to argue now.

22          THE COURT:  Okay.

23          MS. NEWBY:  I try to cut down on the writing.

24          THE COURT:  Okay.  Mr. Eaton?

25          MR. EATON:  That's fine with me, Your Honor.

1              THE COURT:  Okay.  Ms. Newby, proceed.

2              MS. NEWBY:  Thank you.  Well, Your Honor, I know --

3              THE COURT:  You want to come to the podium.

4              MS. NEWBY:  Yes.  I know based on your rulings that

5    you're very familiar with the case law on student loans and

6    the Bruner test.

7              THE COURT:  Uh-huh.

8              MS. NEWBY:  In this case, what we're asking the

9    Court to do is to discharge student loans that, I think it's

10   clear, Mr. Michaud has met the standard for saying that he

11   has made a good faith effort to repay his student loans.  He

12   had taken out the student loans, he'd gotten deferments,

13   he'd gone through their programs before to say, "I need a

14   forbearance, I need a deferment."

15             THE COURT:  Before you go further, how much is the

16   balance?  Is there an agreement by both sides as to what's

17   owed?

18             MS. NEWBY:  It's approximately $24,000.

19             MR. EATON:  Your Honor?

20             THE COURT:  And that includes interest.

21             MS. NEWBY:  Yes.

22             MR. EATON:  That is, Your Honor.  In ECMC's Exhibit

23   1, there's a stipulation of facts which sets forth what the

24   amount of the loan is, specifically tied to the date of

25   January 9th, 2014, with --

1            THE COURT:  Okay.

2            MR. EATON:  And with interest accruing at $4.37

3    per day.

4            THE COURT:  Okay, thank you.  So minimal

5    standard of living, 67 years old. made payments for several

6    -- a number of years.  I haven't calculated them out.

7            MS. NEWBY:  Yes.

8            THE COURT:  Went through deferment for reasons

9    which you would say are justifiable.

10           MS. NEWBY:  Correct.

11           THE COURT:  And shows no real prospect of improving

12   his income.

13           MS. NEWBY:  Correct, Your Honor.  As far as

14   maximizing his income, yes, I understand he can't speculate

15   what the hospital may do or what a future employer may do.

16   But at the age of 67, with his medical issues right now, the

17   fact that Manatee Memorial has even kept him on part-time is

18   pretty impressive since he has to take stints out for

19   treatments and for hospitalizations.

20           He has the option -- I think this is their main

21   thrust.  He has the option of trying to get into one of these

22   income-based repayment plans.  Based on his income and based

23   on the poverty guidelines, his, you know, payment could be as

24   low as zero or, given the taxable social security, it might

25   be, you know, somewhere close to $50 a month.  It would be a

1  small amount.

2          But as was stated in the deposition, and as Mr.

3  Michaud is aware, every year he would have to re-certify his

4  income.  Not a huge deal, but still more paperwork, more

5  stress.

6          Knowing that, you know, if he lives until the age

7  of 92 and does this every year, that that amount, which will

8  then be enormous, given the fact that it's accruing interest

9  at, you know, four dollars and, I think, 37 cents a day,

10  especially if he's making payments of zero to $50 a month,

11  he's going to be steadily increasing that amount.  That when

12  he does turn 92 and it does get discharged, then it obviously

13  is a taxable event.  Maybe he won't be worried about that at

14  92, but it is a concern.

15          Given what his income is and given the fact

16  that his prospects do not have any realistic chance of

17  getting better, to maximize his income, his expenses --

18  you know, even just from the time that we filled out the

19  Interrogatories in November, he's already -- his rent has

20  gone up $34, whereas his social security only went up, I

21  think, $17.  So he's already losing ground.

22          He can't afford even to make, you know, necessary

23  car repairs on his 15-year old vehicle.  So I don't really

24  know what else could be expected in terms of minimizing

25  expenses.

1        He has -- he used his education to further his

2   career.  He had jobs.  He has not shirked from trying to

3   maintain employment.  He's still maintaining employment, but

4   expecting him, realistically, to make payments on this when,

5   under any rubric, he won't be making any actual dent in the

6   debt, I think that he does pass the <u>Bruner</u> test.

7        THE COURT:  Let me ask you, when were the loans

8   taken out?

9        MS. NEWBY:  Well, Your Honor, I think there is some

10  confusion, and I didn't realize -- Mr. Eaton's more thorough

11  than I am -- that our complaint, I don't think, can be

12  correct, because the consolidation loan was in 2001 that

13  consolidated these loans.  So I believe that our complaint,

14  as far as the periods of schooling, were probably incorrect.

15       THE COURT:  Well, for instance, I see in the

16  Interrogatories, and Mr. Michaud testified, he was at Rivier

17  College in 1997 to 1999, but he says he didn't get his degree

18  until 2005, in the complaint.

19       MS. NEWBY:  Right.  And the complaint, I think, had

20  some typos for sure, and I'm sorry that I did not pick up on

21  that.  But the fact that the loans were consolidated four

22  years previously, I didn't think--

23       THE COURT:  So it --

24       MS. NEWBY:  -- makes it feasible

25       THE COURT:  I guess I would draw the inference,

1    unless someone wants to talk me out of it, that the loans

2    were taken out sometime between 1997 and 1999, as opposed

3    to 2005.

4            MR. EATON:  And, Your Honor, I was trying to get

5    that cleared up as well.  There's no dispute that the student

6    loan that we're here on today, that my client holds, is a

7    consolidation loan from November of 2001, which consolidated

8    four loans that had previously been obtained.  So clearly

9    they came --

10           THE COURT:  Before that.

11           MR. EATON:  Before that.

12           THE COURT:  Okay, and --

13           MR. EATON:  But what I was trying to figure out,

14   and I thought maybe that's what we were getting clarification

15   on the testimony, is when he graduated and actually obtained

16   the degrees, which --

17           THE COURT:  I don't think that's clear.

18           MR. EATON:  I thought -- well, I thought he

19   confirmed the dates that were in the complaint --

20           THE COURT:  Well --

21           MR. EATON:  -- when he was on the stand, because

22   you can get your degree after --

23           MS. NEWBY:  Sure.

24           MR. EATON:  -- the fact, and that's what I had

25   assumed had happened.

1        THE COURT:  You can but I don't think that's -- I

2   don't think that's clear.

3        MR. EATON:  For purposes of the loan, Your Honor,

4   there's no dispute on the date of when the loan was obtained,

5   and there's no dispute that it was for loans that he obtained

6   before that date.

7        THE COURT:  Well, why don't we clear that up now.

8        Mr. Michaud, you're still under oath.  Grab the

9   microphone.  Just grab it -- it's right in front of him.

10  And when did -- did you get your degree some time after you

11  attended the college?

12       MR. MICHAUD:  Um --

13       THE COURT:  Stand -- sit down.  Let's go ahead and

14  clear this up now.

15       MR. MICHAUD:  I received the degree because I

16  finished --

17       THE COURT:  Let's go back.  Rivier College, that's

18  the education you borrowed money to seek.

19       MR. MICHAUD:  Right.

20       THE COURT:  And you borrowed four loans.

21       MR. MICHAUD:  Correct.

22       THE COURT:  And did you -- when did you attend?

23  When did you go to that school?

24       MS. NEWBY:  Are these dates correct?

25       MR. MICHAUD:  Yeah, 19 --

```
 1              THE COURT:  Well, from your memory.  Don't just
 2   read something.  You must know when you were --
 3              MR. MICHAUD:  '97 to '99.  And I received it that
 4   December of '99.  I actually had the graduation in '99.
 5              THE COURT:  All right.  Okay, that's all.  All
 6   right.  Anything else, Ms. Newby?  I haven't heard anything
 7   about the circumstances beyond the Debtor's control.
 8              MS. NEWBY:  Well, Your Honor, I think that he did
 9   testify about the circumstances beyond his control.  This
10   whole issue of being unable to pay the student loans came
11   to a head because of his medical condition.
12              THE COURT:  Uh-huh.
13              MS. NEWBY:  He was working at a job which he
14   wouldn't have had much longer anyway because he testified
15   that that company went bankrupt.  But about the same
16   time that was happening, he was having serious medical
17   complications that the insurance company at least found were
18   serious enough that they placed him on long-term disability.
19              He testified about the fact that he's had to have,
20   you know, several operations, procedures, placing stents,
21   the pacemaker that continuously got infected, that he was on
22   intravenous, you know, fluids or antibiotics every day for
23   three hours a day for months.
24              So it wasn't that he did not want to repay; it's
25   just that this medical condition forced him into a position
```

1   where at least he had the private disability so he could make

2   those payments, and he did make those payments while he was

3   getting that disability.

4        Once that disability stopped, which that was over

5   $2,000 a month, and all he had $1,019 in social security

6   benefits and approximately, you know, $700 a month take-home

7   from the hospital, he wasn't -- you know, with a total income

8   of about $1,800 a month, when you have to pay rent and food

9   and gas and everything else, that he wasn't able to make

10  these payments.

11       So I don't think that his health conditions are

12  within his control.  He certainly has been staying on top of

13  them.  He's testified that, you know, now they want to biopsy

14  him for Hodgkin's, so I think he's got a lot of medical

15  issues.  This is not a case of him quitting a job because he

16  didn't like it or not getting along with coworkers or moving

17  around randomly without trying to maximize his income.

18       THE COURT:  All right.  Mr. Eaton?

19       MR. EATON:  Thank you, Your Honor.  Your Honor is

20  well aware of the standard of the Bruner test, which is still

21  the law in the Eleventh Circuit, and it does require the

22  Debtor to prove all three of the prongs:  That he cannot

23  maintain a minimal standard of living if forced to repay;

24  that additional circumstances exist that are likely to

25  persist for a significant portion of the repayment period,

1   and that he's made a good faith effort to repay.

2           And the test is stringent.  And there's no one

3   saying here that Mr. Michaud is leading an extravagant

4   lifestyle or anything of that nature, but that's not what

5   the standard is.

6           And in this particular case, I understand, he's

7   67 years old, he's single, he has no dependents, he is

8   intelligent, he's articulate, he's well-educated, he has

9   two Master's degrees.

10          He consolidated loans in November of 2001, Your

11  Honor, at a time when he was already 53 years old.  And the

12  application that is in evidence as Exhibit 4, shows he chose

13  to pay under an extended repayment plan at that time, which

14  would have been 20 years.  So even at the age of 53, he had

15  anticipated that he would be paying student loans for quite

16  some time.

17          He is working part-time at the hospital, and he has

18  been since November of 2012.  Other than the time when he

19  first indicated he had health problems in 2008, has always

20  worked, so he's got a steady work history, and has even

21  indicated, to a certain extent that he's looking for some

22  full-time employment, although there's no evidence of what

23  that is, other than checking with the hospital.

24          His Interrogatory responses, specifically

25  Interrogatory 23, shows that he is now, based on his

1   clarification of his now current social security benefits,

2   receiving $1,036 a month -- that's after payment, Your Honor,

3   of his Medicare insurance -- and average wages, according to

4   his Interrogatories of $776 a month, which comes to $1,811 a

5   month of income.

6          The Schedule J, Your Honor, which is included in

7   Exhibit 5, shows he had monthly expenses, when he filed his

8   bankruptcy, of $2,300 a month.  And that included $111 a

9   month for cable, internet and phone, $450 a month for food,

10  $50 a month for clothing, $25 a month for laundry and

11  dry cleaning, $60 for recreation, $60 a month for charitable

12  contributions, and $33.75 a month for life insurance.  Those

13  are what were included in his schedules that are in evidence.

14         And one of the exhibits that is in evidence, Your

15  Honor, I think it is ECMC's Exhibit 12, is a life insurance

16  policy in which Mr. Michaud is paying $135 a month for life

17  insurance -- I'm sorry, a quarter, for life insurance.  He

18  has no dependents.  And his schedules reflect that he already

19  owns a plot, a burial plot, in Maine.

20             THE COURT:  How much is the life insurance?

21             MR. EATON:  It's a $50,000 policy, Your Honor.

22             THE COURT:  And is it in the record as to who the

23  beneficiary is?

24             MR. EATON:  It is not, Your Honor.

25             THE COURT:  Okay.

 1          MR. EATON:  I don't believe the policy says.

 2          THE COURT:  Okay, thank you.

 3          MR. EATON:  Exhibit 10, Your Honor, is a spending

 4   summary of Mr. Michaud's from September and October of 2013,

 5   which shows in September he had grocery bills -- grocery

 6   expenses of $465 a month and cable TV of $122 a month.

 7          According to ECMC's Exhibit 11, which is the USDA's

 8   official food plan, the estimated monthly cost for a single

 9   may between 51 and 70 years of age, has various ranges,

10   depending upon whether it's a thrifty plan, which is $199.56

11   a month, up through a liberal plan of $399.84 a month.

12   A moderate plan would be $332.16 a month.

13          So the amount he's spending on his groceries,

14   according to his own exhibit, shows --

15          THE COURT:  I'm sorry, I'm not sure I followed

16   that.  Let's see, you're looking at --

17          MR. EATON:  Your Honor, and I'm sorry, because I

18   had to do an adjusted calculation in light of a footnote that

19   is included in the federal regulation.

20          THE COURT:  Yeah.

21          MR. EATON:  If you look at Exhibit 11, Your Honor?

22          THE COURT:  I am.

23          MR. EATON:  It says male 51 to 70.

24          THE COURT:  Right.

25          MR. EATON:  And it gives various numbers under the

1    monthly case.

2              THE COURT:  And you had -- you said moderate cost

3    plan?

4              MR. EATON:  Let's start at the thrifty plan.  It

5    says $166.30.

6              THE COURT:  Yeah.

7              MR. EATON:  If you look down at footnote 3, Your

8    Honor.

9              THE COURT:  Uh-huh.

10             MR. EATON:  which is the footnote that applies

11   for that particular column under individuals, it says the

12   costs given are for individual in four-person families.

13   For individuals in other sized families, the following

14   adjustments are suggested.

15             THE COURT:  Oh, add 20 percent.

16             MR. EATON:  And that's what I did in giving Your

17   Honor the particular numbers.  That wasn't -- I wanted to

18   make sure that we were using the correct numbers of what the

19   government --

20             THE COURT:  So you're view on a thrifty plan would

21   be 166.30.  And what you actually gave a number --

22             MR. EATON:  Was --

23             THE COURT:  $276.80 for a moderate plan times 1.2.

24             MR. EATON:  I took 166.30, took 1.2, and got

25   199.56.

1           THE COURT:  Okay.  And then you did it again for

2   the 266.

3           MR. EATON:  I did for the low cost, and got 266.76.

4           THE COURT:  Uh-huh.

5           MR. EATON:  Moderate 332.16, and the liberal

6   399.84.

7           THE COURT:  Okay.  All right.

8           MR. EATON:  The tax returns for Mr. Michaud, which

9   are set forth in Composite Exhibit 6, go all the way back

10  between 2008 and 2012.  He did not have one for 2013.  His

11  adjusted gross income in those years -- in 2012, it was

12  $42,029.  2011, it was $35,715.

13          THE COURT:  I'm sorry.  What was it for 2012?

14          MR. EATON:  $42,029.

15          THE COURT:  Uh-huh.

16          MR. EATON:  2011, it was $35,715.

17          THE COURT:  Uh-huh.

18          MR. EATON:  2010, it was $34,912.

19          THE COURT:  Okay.

20          MR. EATON:  The Department of Health poverty

21  guidelines for 2014 show that a poverty level for a family of

22  one for 2014 is $11,670.  Even by Mr. Michaud's own estimate

23  of what his income is expected to be over the next 12 months,

24  which is approximately, I think, 21, $22,000, it's much

25  higher than the federal poverty level guideline.  And it

1   has been since he's been filing his tax returns, at least

2   the ones that we have going back to 2008.

3          But what's also important, Your Honor, is that his

4   tax returns show that he has had substantial tax refunds for

5   each of the years going back to 2008, even through 2012.

6          In 2008, he had a tax refund of $3,376.  2009, he

7   had a tax refund of 3,916.  2010, he had a tax refund of

8   $4,432.  2011, he had a tax refund of $2,934.  And in 2012,

9   he had a tax refund of $1,072.

10          In his schedules, which he filed in his case,

11   specifically Schedule B, in response to No. 18, he indicated

12   that he anticipated getting another refund for 2013.  The

13   amount was not listed.

14          THE COURT:  Well, some of that would go to the

15   Trustee.

16          MR. EATON:  If there was an exemption to a claimed

17   exemption, and I don't know if there was.

18          THE COURT:  Yeah, and I don't know either.

19          MR. EATON:  I don't know if that has been done

20   in this case, Your Honor.  I think he may have gotten a

21   discharge, but I don't know the answer to that question.

22   My point, Your Honor, though, is he's been very consistent

23   in getting tax refunds for the last five years and seems to

24   think he's going to get one in 2013.

25          The deposition testimony of Ms. Swedback and the

1   federal regulations, specifically, Your Honor, 34 CFR 685,

2   make it clear that this loan is eligible for consolidation

3   into the Ford program and for repayment under what's called

4   the income-based repayment, also called the IBR.

5           It's also eligible for repayment under the IBR

6   within its existing place, which is the FFELP program, and

7   that's found in 34 CFR 682.215.

8           I know Your Honor's familiar with how the IBR

9   generally works, but it's a straight formula.  You take the

10  adjusted gross income from the Debtor's filed federal tax

11  return.  You subtract from that 150 percent of whatever the

12  federal poverty guideline amount is for a family of that

13  Debtor's size.

14          You take 15 percent of the difference, you divide

15  by 12, and that's your monthly calculation for the next 12

16  months.

17          THE COURT:  You are generally in agreement with

18  Ms. Newby that'd be maybe $50 a month?

19          MR. EATON:  The $50 a month that she's talking

20  about is the following.  And I'll tell you what we use to

21  get there.  His Interrogatory responses showed that his

22  anticipated income, gross income, over the next 12 months,

23  would be $21,540.  We used that as the guide for assuming

24  that's your adjusted gross income.

25          THE COURT:  Right.

1          MR. EATON:  And if you do that assumption, 150

2    percent of the federal poverty guideline amount in 2014, for

3    a family size of one, would be $17,505.  If you subtract that

4    from the 21,540, 15 percent of that amount, divided by 12,

5    yields an IBR payment of $50.43.  The reason why it may be

6    lower is because not all social security income is considered

7    income for purposes of calculating your adjusted gross

8    income.

9          And we know that by simply looking at his tax

10   returns that he filed, including for last year, where he had

11   an amount for adjusted gross income that included his total

12   social security benefits, but only a portion of that is

13   actually going to be included as taxable income for purposes

14   of calculating what is his adjusted gross income.

15          THE COURT:  And the interest accrual is --

16          MR. EATON:  $4.37.

17          THE COURT:  Okay.  So $4.37 times 30 is what?  $120

18   a month in interest?

19          MR. EATON:  And the point is, it may not cover --

20   that IBR calculation may not cover --

21          THE COURT:  Right.

22          MR. EATON:  -- the full amount.  If he chose to

23   do the IBR, it might not cover that same -- the interest

24   calculation.

25          He could also choose another income-based type of

```
 1   payment called the income contingent repayment, which is also
 2   found in the regulations in the same spot.  It's a similar
 3   process that's tied to the federal poverty guideline amount
 4   but it's a different calculation and will yield a different
 5   and higher number that -- and I haven't done that calculation
 6   but -- so if the Court can look at it, you take the adjusted
 7   gross income and you subtract -- it's in the federal reg --
 8            MS. NEWBY:  Well, I'm going to object, Your Honor.
 9   There was actually deposition testimony about that IBR.
10            THE COURT:  I'm sorry, there was what?
11            MS. NEWBY:  There was actually -- I'm sorry --
12   deposition testimony about the IBR, but there was no
13   testimony about the income contingent.  It was mentioned,
14   but there was nothing about how it operated or anything
15   else, so he's testifying at this point.
16            MR. EATON:  Actually I'm not, Your Honor.  I'm
17   actually talking about what's specifically in the federal
18   regulations, not what Ms. Swedback testified to.
19            THE COURT:  All right.  Well, why don't you do
20   this.  Why don't you give me a citation and then explain it
21   to me?
22            MR. EATON:  It's contained, Your Honor -- it's
23   within Chapter 34, 680 -- 34 CFR Chapter 685.  I believe it's
24   within 220, 208 or 209.  I'm not sure which specific portion.
25            THE COURT:  All right.  And you see that -- you
```

1  see the jargon.  It has an acronym, too.  ICRP.

2           MR. EATON:  ICRP.

3           THE COURT:  Uh-huh.

4           MR. EATON:  And it's -- the formula, again, it's a

5  straight formula.  It's the adjusted gross income less 100

6  percent of whatever the federal poverty guideline amount is

7  for a Debtor's -- of that family's size, versus 150 percent

8  on an IBR.

9           THE COURT:  Right.

10          MR. EATON:  And then you take 20 percent of the

11 difference and divide by 12.

12          THE COURT:  Okay.

13          MR. EATON:  And the federal poverty guidelines,

14 Your Honor, are set forth in ECMC's Exhibit 7, and a family

15 size of one is $11,670.  So it's a straight mathematical

16 calculation.

17          We used the IBR calculation, Your Honor, because it

18 results in a lower monthly payment and would be considered

19 current of the student loan.  But Your Honor raised the point

20 of:  Well, that might not take care of the interest that was

21 accruing.  And I was pointing out that there is another

22 alternative, and I don't know -- because I haven't run that

23 number, of whether that particular calculation, using the

24 21,540, would yield enough to take care of the interest.

25          THE COURT:  I don't know.  I mean, if the

1  difference is 100 percent of the poverty level.  And starting

2  with 21,540 minus 11,670, that's about $10,000 times 20

3  percent.  That's $2,000.

4           MR. EATON:  Divided by 12.

5           THE COURT:  Divide that by 12.  It's about $80 a

6  month.  And the interest is rolling up at 120.

7           MR. EATON:  It would be.  And Ms. Swedback's

8  testimony, Your Honor -- because he's also eligible for a

9  repayment option that will amortize and pay off the debt --

10 includes one that would be payable over 240 months, 20 years.

11 It's called the standard repayment plan.  And that would be a

12 monthly payment of $183.16 a month.  There's no dispute here

13 that Mr. Michaud has not sought to consolidate his loan into

14 the Ford program or into seeking repayment under the IBR.

15          THE COURT:  Is there any additional features, like

16 the forgiveness of the interest?

17          MR. EATON:  There's not a forgiveness of the

18 interest.  What happens at the end -- and I know Your Honor

19 is aware of this -- is at the end of the 25-year period --

20          THE COURT:  Uh-huh.

21          MR. EATON:  At the end of the 25-year period --

22          THE COURT:  The IBR.

23          MR. EATON:  Under the IBR, and the ICRP.

24          THE COURT:  Right.

25          MR. EATON:  Under both.  There is forgiveness of

1    the debt by the Department of Education.  The debt is wiped

2    out.  And there was argument that was made by Ms. Newby --

3    there was no testimony, by the way, that that was a concern

4    of Mr. Michaud at all.  But the argument that was made by

5    Ms. Newby was that, well, that's a taxable event because

6    there's going to be debt forgiveness.

7             And the courts have addressed and looked at that

8    particular issue, Your Honor.  And the vast majority of

9    decisions that have come down have said, first of all, it's

10   too speculative to know what the tax laws are going to be in

11   25 years.  We don't know what those laws are going to be in

12   25 years.  It may not be a taxable event at all.

13            Even under today's existing tax laws, it's only a

14   taxable event for debt forgiveness if the Debtor is solvent.

15   And, Your Honor, I would cite to 26 U.S.C. Section 108 of the

16   Tax Code, which specifically says that debt forgiveness is

17   only taxable to the extent the Debtor is solvent.

18            The schedules that are in evidence show that he's

19   not solvent.  He rents, he has an old car, he's got used

20   furniture.  His schedules show that the value of his assets

21   on the loan today would render him insolvent, meaning if the

22   debt was discharged today, under today's existing tax laws,

23   it would not be a taxable event at all.  It's a red herring,

24   the argument that he's going to face the big stress at the

25   age of 92 of a huge tax liability.  It's not the case.

1              And I would cite Your Honor to In re Jesperson,

2    571 F.3d 775, the Eighth Circuit, saying that the lower court

3    erred by ignoring the fact that the cancellation of the debt

4    at the end of the 25-year period for the ICRP only results in

5    a taxable income under existing laws if the Debtor is

6    insolvent.

7              In re Bronsdon, 421 B.R. 27, District Court of

8    Massachusetts.  The cases that I mentioned before, Your

9    Honor, with respect to the speculativeness of what the tax

10   laws would be in 25 years, there's been a number of courts.

11   The Jesperson and Bronsdon courts of which I just spoke.

12   The District Court in the Northern District of Florida in the

13   ECMC v. Stanley case, 300 B.R. 813.

14             My point, Your Honor, for pointing that out, is the

15   fact that the debt's going to get wiped out in 25 years is

16   not a basis to say he's going to face this big tax liability.

17   It's only going to be the case if he accumulates a lot of

18   assets between now and then, and it's going to be based upon,

19   as Your Honor pointed out, a debt that will continue to

20   increase by $4.37 a day.

21             So that that liability against which his solvency

22   will be measured is going to increase as well.  And further

23   reducing the likelihood of there being any taxable event at

24   all.

25             The evidence is clear in this case that Mr. Michaud

 1   is working.  He is working part-time.  It sounds like, from

 2   what I've been able to gather, that his testimony is it's an

 3   undue hardship because he has tight finances, he's 67, and he

 4   does have certain health issues.  But the health issues, by

 5   his own testimony, do not keep him from working.  And he even

 6   indicated that he wishes to work full-time and has tried to

 7   do so, at least looking at the hospital.

 8        The student loan options that are available to him

 9   under the Ford program and the IBR show in this case that he

10   has not met the three prongs of the Bruner test.  He can

11   maintain a minimal standard of living and make the IBR

12   payment.  He can maintain a minimal standard of living and

13   make the IBR payment -- the ICRP payment.  He can do both of

14   those.  He can do both of those, Your Honor.

15        The Court in In re Hart, 438 B.R. 406, Eastern

16   District of Michigan, said although the minimal standard of

17   living does not require a Debtor to live at or below the

18   poverty level, the analysis begins and ends with the Debtor's

19   income when it is between two and three times the poverty

20   level amount.  He's at that.  Even under the income that he's

21   making now, Your Honor.

22        The monthly expenses that he has, he's making a $60

23   a month charitable contribution, he's paying $33.75 for life

24   insurance, he's got $60 that he's paying for -- $60 that

25   he's paying for laundry and clothing of $50 a month.  All of

1    those are expenses that are not minimally necessary.  The

2    cable TV is not --

3            THE COURT:  What was the first one?  $60 for --

4            MR. EATON:  It was $60 for charitable

5    contributions, which is in his Schedule J that's attached

6    to his petition.

7            If you look, Your Honor, at his tax returns, he

8    has made substantial contributions, charitable contributions

9    of over $1,000 each of the past five years.  These are

10   amounts that could be used, Your Honor, to pay the student

11   loans.

12           If you eliminated just some of these expenses, it's

13   not a problem for him to be able to pay the $50 a month that

14   he would pay, assuming it would be the income that he says

15   he has right now, over the next 12 months, not even taking

16   any type of deduction for only that portion of the social

17   security he's receiving that would perhaps come out and

18   likely come out of the calculation for the IBR.

19           The Court in In re Hart, which was at the Eastern

20   District of Michigan, the Court affirmed the holding that the

21   Debtor did not prove Bruner's three prongs.  Cell phones,

22   cable, internet and recreational expenses are not part of the

23   minimal standard of living.

24           And all of the courts that are analyzing this,

25   Judge, look to comparing what those expenses are, what the

1  income is, against that of the IBR or the ICRP payment.  The

2  Stanley court, of which I pointed out earlier, had a 50-year

3  old Debtor with a net income of $2,500 a month, who did not

4  meet prong one, where the Court concluded she could pay $500

5  a month in ICRP payments.

6         Judge Williamson in the In re Matthews-Hamad

7  decision, 377 B.R. 415, found that the Court -- that the

8  Debtor could make the payments under the ICRP of $200 to $300

9  a month.

10        Judge Briskman in In re Sturtevant, 2011 WL

11 1656111, found that the Debtor could make the payments under

12 the ICRP payment, and found that the Debtor did not prove

13 prong one.

14        And the Court in the Northern District of Indiana,

15 In re Keller, 326 B.R. 142, held that a 62-year old Debtor

16 with a monthly income of $2,400 a month did not meet his

17 burden of Bruner where he could afford to make the ICRP

18 payments of $88 a month.

19        I just point this out, Your Honor, because the

20 Courts are looking at the analysis of how the minimal

21 standard of living applies when you're faced with the

22 prospect of having a reduced payment that is available to

23 the Debtor under the IBR or the ICRP.

24        Tax refunds.  The Courts have consistently held

25 that you must take into account the tax refunds that a Debtor

1    has received in calculating what amounts are available in

2    order to pay student loans.

3            Last year, 2012, the last tax return we have, Mr.

4    Michaud had a refund of $1,072.  2011, $2,934.  2010, $4,432.

5    These are amounts that are available because they're income

6    that has been given to the government that he's going to

7    get back, which the Courts look at in calculating what's

8    available to make their student loan payments.

9            Judge Briskman, in the Sturtevant decision I cited

10   to you a few minutes ago, said that you to calculate the tax

11   refund amount that the Debtor was getting.

12           Judge Jennemann did so in In re Kelly just last

13   august, 496 B.R. 230.  Debtors understated their income by

14   not including tax refunds.

15           The Northern District of West Virginia, In re

16   McNemar, 353 (sic) B.R. 621.  All of these courts, Your

17   Honor, show that that is income that must be taken into

18   account.

19           If you average out the refunds Mr. Michaud has

20   received over the last five years, it's an average of $3,146,

21   which is --

22           THE COURT:  I'm sorry, how much?

23           MR. EATON:  $3,146 of refunds, if you add up

24   between 2008 and 2012.

25           THE COURT:  Right.  Over 60 months.

1          MR. EATON:  No.  I took those five.  That's an

2   average each year --

3          THE COURT:  Yeah.

4          MR. EATON:  Of $3,146.  And then you would take

5   that divided by 12.

6          THE COURT:  Yeah, either way.

7          MR. EATON:  Either way.  The other one, Your Honor,

8   is even if you just looked at the lowest one that he showed,

9   which was 2012, which was $1,072, that comes to $89.33 per

10  month.  That alone is enough to make the payments under the

11  IBR and perhaps the ICRP.

12          So on the record that we have, the income that we

13  have, the payments that are available to him, the expenses

14  he's showing, and what they're for, he can maintain a minimal

15  standard of living and make the required payments under the

16  IBR and the ICRP, and he fails prong one.

17          And that's the end of the story.  You don't even

18  need to go to prong two or to prong three.  Now, I think he

19  hasn't met those either.  I understand he's indicated that

20  he's 67 years old and that he's only working part-time, but

21  the standards that the Courts have looked to, including the

22  Eleventh Circuit in Moseley, is a certainty of hopelessness.

23          And that's when you're suffering some sort of

24  debilitating illness or disease from which you cannot work

25  or do anything at all.  That's not what he has.  Even the

1   conditions that he's indicated he has, they're treatable,

2   he's working, he's able to work, and even as he said, trying

3   to work more.

4        There's no evidence to show that he has not been

5   able to work in the past.  He's had a strong history of

6   working until he had his illness, he said, in 2008, and

7   is still working.

8        It seems to be that the key factor that he has is

9   tight finances and his age.  But the courts are very, very

10  consistent, Your Honor, in saying that you don't meet prong

11  two by using age as the basis of saying you can't pay your

12  student loans.

13       In re Spence, the Fourth Circuit, 541 F.3d (sic),

14  the Court held that no undue hardship for a Debtor in her

15  late 60's with $160,000 of student loan debt but was able to

16  work.  She was earning $26,000 a year and $267 in monthly

17  social security.  But the age and being able to work meant

18  she didn't fall within the exceptional circumstances of prong

19  two.

20       Jones v. BankOne of Texas, 376 B.R. 130, the Debtor

21  was 48 years old and did not want to apply to Ford because of

22  the 25-year burden.  And the Court said the Debtor cannot now

23  use her age as grounds to avoid repaying her student loans,

24  because she chose to go to school later in life which

25  resulted in the student loan debts persisting until later

1   in life.

2          Mr. Michaud got the loan from ECMC that's at issue

3   here in 2001 and chose to pay it under the extended repayment

4   plan when he was 53 years already.  He envisioned paying them

5   later into life.

6          Goforth v. United States Department of Education,

7   Debtor in -- 466 B.R. 328.  Debtor in the mid-50's did not

8   show additional circumstances.  Age, standing alone, without

9   serious disability or illness, is not enough.

10         So in this particular case, the Debtor hasn't shown

11  that he's proven the certainty of hopelessness that would

12  preclude him from being able to pay for a significant period

13  of the repayment period of the student loan that's here.

14         Which takes us to the third prong, a good faith

15  effort.  And I don't dispute that Mr. Michaud made some

16  payments on the student loan.  The amounts that he paid,

17  there's no evidence of what those were that -- the dates of

18  when he made payments.  There's also periods for several

19  years in which were the deferments or forbearances in which

20  there wasn't anything paid.

21         But it's not just whether or not he made payments.

22  You also have to take the steps to maximize your income and

23  minimize your expenses.  And here, the maximization of the

24  income -- I know he testified that he tried to get a job

25  full-time with the hospital but there's no evidence of any

1  efforts outside of the hospital to look for a full-time job

2  at all.  And we don't know what that is.  He's working part-

3  time but no effort -- no evidence to show of any other

4  efforts to maximize.

5          Minimizing the expenses.  He's still paying for the

6  cable TV, the cell phone, even if it is just one that he can

7  make time on minutes.  He's paying for a life insurance

8  policy.  Those are expenses that can be minimized, Your

9  Honor.

10         The charitable contributions that have been made

11  for the past -- between 2008 and 2012, Your Honor.  2012,

12  his own tax returns show that charitable contributions were

13  $1,343.  2011 $1,484; 2010 $2,410; 2009 $1,564; and 2008

14  $1,450.

15         The Court in the Middle District of Georgia, In re

16  Bush, 450 B.R. 235, indicated that while the Debtor's $320

17  per month for projected expenses for charitable contributions

18  were laudable, it should not be done at the taxpayer's

19  expense.

20         Here, Your Honor, that's what we seem to have.

21  We're having charitable contributions made.  Those could be

22  used to pay for the student loans.

23         The courts also, in analyzing good faith, look to

24  see whether or not the primary purpose of the bankruptcy was

25  to discharge your student loans versus trying to get just a

1    fresh start with other debts.

2         And they look at what the percentage is of your

3    student loan debt to what your total amount of unsecured debt

4    is.  And here, if you look at the Debtor's Schedule F, there

5    are eight creditors listed.  That's it.  There's only eight

6    creditors listed.  64 percent of the debt is with respect to

7    the student loan that's at issue in this particular case.

8         THE COURT:  I'm sorry, how much?  74?

9         MR. EATON:  64.  Six four percent.  And that you

10   can get just by looking at Schedule F.

11        The Court in, In re LK, 351 B.R. 45, Bankruptcy

12   Eastern District of New York, 2006, ratio of more than

13   70 percent indicated a lack of good faith.  In re Kidd,

14   Bankruptcy Northern District of Georgia, 472 B.R. 857, the

15   Court concluded that the Debtor did not meet good faith,

16   where the Debtor had not made the payments on the student

17   loans, and where student loan debt constituted 70 percent

18   of her total debt.

19        In re Kelly, Bankruptcy Eastern District of New

20   York, 351 B.R. 45, the Court found that the Debtor did not

21   make a good faith effort to repay where the student loan debt

22   constituted more than 70 percent of the debt.

23        And it's not a per se, Your Honor, and I'm not

24   suggesting that it's a per se finding of lack of good faith.

25   It's evidence of lack of good faith when you look into the

1   other factors, of which I was just speaking, and also the one

2   relating to the following, which the courts also look at.

3   And that is not taking advantage of available restructuring

4   options including the IBR.  And I'm well aware that the

5   Eleventh Circuit has indicated that not taking advantage of

6   the IBR --

7           THE COURT:  Is not --

8           MR. EATON:  -- is not *per se* a lack of good faith.

9           THE COURT:  All right.

10          MR. EATON:  And I don't dispute that, Your Honor.

11  My point, though, is if you look at that, when coupled with

12  all of the other factors of which I've just spoken, all of

13  that is indicia of a lack of good faith to repay the student

14  loan when you take that all into consideration.

15          I'm not saying that not doing the IBR in and of

16  itself is bad faith.  I'm not suggesting that and I've never

17  suggested that to any Court.  What I'm suggesting is that is

18  evidence that the Court considers when looking at all of the

19  other factors of which I just spoke.

20          And at least three other -- two other courts of

21  which I'm aware, In re Sturtevant, the one I spoke about

22  earlier by Judge Briskman, the Court rejected -- the Court

23  found the Debtor did not prove good faith when, among other

24  things, she did not take advantage of the available ICRP.

25  Judge Olson did the same in In re Risotto (phonetic), in

1  which the Debtor did not take advantage of the Ford program

2  when she could afford to make an IBR payment of $39.38.

3          Mr. Michaud's testimony today as to why he did not

4  take advantage, or doesn't want to take advantage of it, is

5  that he doesn't think that he should have to deal with the

6  burden and stress of giving his financial information each

7  year to the Department of Education so they can calculate the

8  new amount of what the next 12 months payments would be.

9          Respectfully, Your Honor, that's, I think, indicia

10  of a lack of good faith.  There's no stress in giving them a

11  copy of a tax return and letting them calculate what his

12  monthly payment would be.  It's done once a year; that's it.

13  It's not a stressful event to do that and I don't think that

14  that shows a good faith effort to repay.

15          There was no testimony by Mr. Michaud at all that

16  he was concerned about tax ramifications.  That was the

17  argument of Ms. Newby that she made when she did her closing.

18  And as I previously indicated, the tax ramifications here,

19  Your Honor, are speculative.  And based upon the facts we

20  have here, because he's insolvent under his own schedules,

21  are non-existent.

22          So in this particular case, Your Honor, I don't

23  believe that the Debtor has been able to satisfy his burden

24  of proving that he's been able to make a requisite showing of

25  undue hardship in order to try to get out of his student

1  loans.

2          I think, Your Honor, that -- I think Your Honor

3  needs to look at what the Court in Cox said in adopting the

4  Bruner test.  The government is not twisting the arms of

5  potential students.  The decision of whether or not to borrow

6  for a college education lies with the individual.  Absent an

7  expression to the contrary, the government does not guarantee

8  the student's financial success.  If the leveraged investment

9  does not generate the return the borrower anticipated, the

10  student, not the taxpayers, must accept the consequences of

11  the decision.  In this case, Your Honor, I don't believe the

12  Debtor has met his burden, and that this loan should remain

13  nondischargeable.  Thank you, Your Honor.

14          THE COURT:  Thank you.  Ms. Newby?

15          MS. NEWBY:  If I could just take a couple minutes,

16  Your Honor.  The fact of the matter is, Your Honor, I believe

17  we have met the burden.  According to ECMC, and they admit,

18  Mr. Michaud is insolvent.  His income, if you look at -- Mr.

19  Eaton outlines some of the expenses that he found were not

20  necessarily objectionable to living but that could be used

21  for repayment of the student loan.

22          If you look at the exhibit that he was referencing,

23  number 10, which is the graph, the pie chart, and he says,

24  well, you know, the cell phone, the charity, the laundry, the

25  clothing, the life insurance, the entertainment, not one

1   single thing -- not one single of those items that he

2   mentioned is listed as an expense here.  And Mr. Michaud is

3   still $300 in the hole for that month.

4           The fact is, yes, in past years his tax returns

5   showed that he gave to charity.  Obviously, he went to

6   theology school.  If you look at his tax returns and who he

7   gives to, it's generally Catholic charities.  But the fact

8   is, that was in the past.  Everything came to a screeching

9   halt when his income dropped because of the disability

10  payments ceasing.  That was last year.

11          If you look at an average of the last five years of

12  tax returns, then maybe you come up with $3,600, but I think

13  probably, you know, the 2012 is the most indicative.  That

14  was a little over $1,000.  That, yes, spread over a year is,

15  you know, $85.00 a month approximately.

16          But if you look at the numbers on -- not

17  necessarily even the petition, not necessarily the pie

18  charts, even factoring that $85.00 without the charitable

19  giving, without clothes or life insurance or entertainment,

20  he's in the hole to begin with.

21          The petition in Schedule J just put him deeper in

22  the hole.  You know, he was at a negative $600, I think, on

23  Schedule J.  On these pie charts, he's 3 to $400 in the hole

24  every month.

25          So the fact is, it isn't that he doesn't -- Mr.

1  Eaton talked about the fact that the case law from various

2  different jurisdictions, various different cases.  Each of

3  these cases is incredibly fact-based.  So, yes, someone who

4  is bringing him $2,500 a month may be able to afford a $500

5  payment because her expenses are not the same.  She doesn't

6  have Mr. Michaud's medical expenses.  She may not have a

7  fixed rent.  She may live with parents.

8          Each of these cases is in its own fact pattern.  I

9  think that's the whole point of these income-based repayment

10  plans too, is it's supposed to be suited to each individual.

11          In this case, he talks about the fact that even

12  though it's not required, even though the case law says that

13  not applying for these programs doesn't necessarily evince a

14  lack of good faith, that is sort of what he's implying, and

15  he talks about the certainty of hopelessness.

16          To me, it's the other way around.  Mr. Michaud

17  didn't apply for these programs because he did have a

18  certainty of hopelessness.  He can see into the future and

19  all the future seems to him is to be a big morass of medical

20  bills.

21          You can say that he should have made more effort

22  with outside agencies to find a full-time job, but I think

23  the reality of life is that a 67-year old with a host of

24  medical issues is not going to be snatched up at a high

25  paying job.  If he were able to, he would have found it

1   by now.

2        The percentage of debt, that's another red herring,

3   as Mr. Eaton said.  I guess you could look at it as if a lot

4   of the debt is student loan, that evinces a certain lack

5   of good faith, but in this instance his whole debt is

6   approximately $36,000 on Schedule F.

7        What that means is that he has been living an

8   incredibly minimal lifestyle.  All he had was the student

9   loan and about $12,000 worth of debt on credit cards because

10   he was trying to live a very spartan life style.

11        So that what percentage it is of the overall debt,

12   I don't see the logic in saying, well, he should have gone

13   out and spent much more on credit cards or gotten much more

14   debt, when he's driving a 15-year old car that he can't even

15   afford to fix all the brakes on.  I don't see that as an

16   argument that has a lot of merit.

17        Your Honor, I think he has met the Bruner

18   requirements.  I think he has specifically met the good faith

19   repayment.  He did pay for years.  He always followed the

20   program before, asking for forbearance, asking for an

21   abatement.  He didn't do it as far as applying for these

22   programs because he doesn't see that anything is ever going

23   to change.

24        And the fact of handing over, you know, sure, his

25   social security statement or his tax return every year, okay,

1   it may not seem like a huge burden, but all it is a reminder

2   every year, yes, you're still insolvent, yes, you're still

3   poor, yes, you can still not afford anything.

4           I think we've met each of the indicators.  I think,

5   sure, if you want to comb through all the cases, you can

6   find cases that say one thing, you can find cases that say

7   another, but the bottom line is all the cases say you don't

8   have to live at the poverty level, you don't have to live in

9   a box under the bridge to be able to meet this standard.  And

10  I think his expenses and his income meet the standard.

11          THE COURT:  All right, thank you.

12          MR. EATON:  Your Honor, I only want to say one --

13  reference one thing.  I think every Debtor -- or just about

14  every Debtor that comes into this court is insolvent.  That's

15  not the issue of whether or not you have an undue hardship.

16  That's not the issue and that's not the parameters by which

17  we decide whether or not an undue hardship has been met.

18          If it was whether or not he was insolvent, then

19  just about every Debtor would be entitled to a discharge of

20  their student loans and that's not the law.  It's a three-

21  prong test, period,

22          THE COURT:  Well, the three-prong test means you

23  have to kind of walk through the facts -- look at the facts

24  through the filter of that lens, rather than just using some

25  kind of totality of the circumstances.

1          But what we have here is someone who lives at a

2     minimal standard of living, although it's maybe $10,000 a

3     year above the poverty level, and 67 years old.  However you

4     look at that, even if he's bright and articulate, the Debtor

5     is at the end of his working career.

6          I mean, maybe he's got another two years left of

7     working, maybe he's got another ten years.  But, you know,

8     you start looking at mid-70's and basically you're going to

9     be on social security.

10         He has a 15 or 14-year old car, and at some point,

11    that's going to have to be replaced by something.  And I

12    think there's good faith here.  The question really is, prong

13    one and prong two and whether the double whammy of losing his

14    job to a company that went out of business at the same time

15    he began having chronic heart problems of some kind, now

16    requiring the Debtor to pay $10,000 a year, at least this

17    last year, $3,000 a year in medications -- maybe the other

18    expenses are not annually occurring.

19         Whether that plus the availability of an income --

20    I mean, it seems to me the IRCP and the IBR are to keep the

21    thing in play while someone has the possibility of improving

22    their circumstances.  Keeping their obligation alive while

23    they have a prospect of increasing their financial means.

24    And generally that's a younger person.  That's someone who's

25    at a lower level of a career path, and still has some career

1  path to grow and benefit from.

2          So these are all the factors that I see at play

3  here.  And then you throw in some other factors like the life

4  insurance and the charitable expenses.  I'm not sure how you

5  square that with a minus 600 or even a minus 300 a month in

6  income, whether that hole is plugged every year by the

7  refunds, I don't know.

8          But there are items on the expense list that could

9  be used to throw at an IBR, but apparently not enough to

10  cover the accrual of interest to keep the debt from growing

11  even larger.  And so finally that comes down to whether

12  there's any prospect of ever repaying this debt off.

13          So I'm going to take this under advisement, but

14  that's the way I see the factors.  If I've missed something

15  -- the argument here was pretty clear and very thorough.  And

16  from Ms. Newby's standpoint, it's whether I can apply the

17  lens or the filter of Bruner to these particular facts, and

18  from Mr. Eaton's standpoint whether the Debtor has failed on

19  any one of the prongs.  And we'll print the transcript and

20  make a decision in due course.  Yes, sir?

21          MR. EATON:  Thank you very much, Your Honor, and I

22  appreciate the Court's ruling or comments.

23          THE COURT:  Ruminating.

24          MR. EATON:  Comments or ruminations.

25          THE COURT:  Ruminating.

 1          MR. EATON:  I would just ask that the Court take a

 2   look at some of the cases that we've cited.

 3          THE COURT:  Yeah, of course.

 4          MR. EATON:  And especially because in light of the

 5   Court's comments that the view is that the IBR or the ICRP

 6   was supposed to take someone into the ability to try and

 7   improve, and then perhaps getting into something else, for

 8   example, a younger person.  The cases we've cited to apply it

 9   for are elder -- more elder individuals, including people in

10   their 60's.  And I just think that the Court ought to look at

11   that.

12          THE COURT:  Well, I'll look at that.  That's so

13   counterintuitive, but I will look at that.  All right, we'll

14   be in recess.  Thank you very much.

15          MR. EATON:  Thank you very much, Your Honor.

16          MS. NEWBY:  Thank you.

17          COURTROOM CLERK:  All rise.

18      (Proceedings concluded at 3:49 p.m.)

## CERTIFICATE

I certify that the foregoing is the official verbatim transcript prepared to the best of my ability from the logs and digitally-recorded audio proceedings of the above-entitled matter.


_____          March 3, 2014
Cheryl Culver (CER, CCR)                  Date
Transcriber


I certify that the foregoing is a federally certified transcript authenticated by:

_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com